# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

No. 3:19-cr-00113 (JAM)

JUSTIN DAVENPORT,
*Defendant*.

## ORDER DENYING MOTION TO SUPPRESS

Defendant Justin Davenport has moved to suppress evidence that the police seized from his home as well as statements he made to the police upon his arrest. As to Davenport's claim that the police unlawfully searched his house, I conclude that he voluntarily consented to the search. As to Davenport's claim that the police violated his *Miranda* rights, I conclude that the *Miranda* warnings he received, as based on a form issued by the Connecticut Judicial Branch, reasonably conveyed his constitutional rights, if only barely so. I will therefore deny the motion to suppress.

## BACKGROUND

Davenport has been charged by superseding indictment with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). Doc. #52. The charge against him stems from a firearm that local police recovered from his home in Norwich, Connecticut.

Davenport has moved to suppress the firearm and other evidence found by the police in his home as well as his accompanying statements to the police. Doc. # 18. Based on the evidence presented at the suppression hearing, I make the following factual findings.[1]

---

[1] Doc. #46 is the transcript of the suppression hearing. Parentheticals denote the witness testifying. The correspondence of the page numbers to the witness testifying is as follows: 5-83 (testimony of Detective Kevin Wilbur), 83-123 (testimony of Officer John Tangney), 123-86 (testimony of Lieutenant Chris Conley), 186-216

On December 13, 2018, Norwich police officers responded to reports of a shooting at a local bar.[2] The responding officers were told that Davenport and an individual with whom he had been feuding were at the bar on the night of the shooting and that a dark-colored sport-utility vehicle ("SUV") was involved and had left the scene.[3] After reviewing local camera footage and aware that Davenport drove a dark-colored SUV, the officers decided to conduct a further inquiry of Davenport.[4]

At around 10:00 a.m. the following morning, several Norwich police officers—including Lieutenant Chris Conley, Detectives Kyle Besse, Kevin Wilbur, and Steven Schmidt, and Officer Peter Karasuk went to Davenport's residence.[5] The officers found Davenport at an auto body shop next door to his residence, attempting to repair or replace a flat tire on a black SUV.[6]

When the officers began questioning Davenport about the shooting, he denied that any weapons were fired from his vehicle, and he gave the officers written consent to search the SUV at approximately 10:22 a.m.[7] The officers searched the vehicle for weapons, then called for it to be towed and impounded.[8]

When the officers noticed Davenport texting during their continued questioning, Detective Besse seized two cell phones from Davenport's hands and "just put them on the hood

---

(testimony of Detective Steven Schmidt), 216-62 (testimony of Officer Peter Karasuk), and 263-307 (testimony of Nakeema Williams). Davenport filed an affidavit in support of his motion to suppress, Doc. #18-2 at 8-10, but he did not testify at the suppression hearing.

[2] Doc. #46 at 8.

[3] *Id.* at 9.

[4] *Id.* at 9-10.

[5] *Id.* at 10, 54-55, 64-65, 81. The officers are referred to by the titles they held at the time.

[6] *Id.* at 11-12, 58; Ex. 100 (photo of auto body shop and Davenport's residence).

[7] Doc. #46 at 12-23; Ex. 4 (consent to search vehicle).

[8] Doc. #46 at 21, 29.

of the car."[9] Davenport then gave the officers written consent to search both phones at approximately 10:40 a.m. and 10:50 a.m.[10]

At around 11:00 a.m., Davenport's vehicle was towed away with an escort by Officer Karasuk.[11] Davenport and the remaining four officers then crossed over from the garage property to the driveway on the side of Davenport's residence.[12] The residence includes the second and third floors of a house, and it has entrances at the top of an interior stairwell at the front of the house as well as at the top of an exterior stairway on the back of the building.[13] Davenport told the officers that his wife, Nakeema Williams, was inside the home.[14]

Detective Wilbur and Officer John Tangney, who had just arrived, stayed with Davenport in the driveway, while Lieutenant Conley and Detective Schmidt went up the back stairwell and knocked on the door.[15] Meanwhile, Detective Besse approached the front entrance.[16] Williams answered the back door, but when Lieutenant Conley and Detective Schmidt explained that they were investigating a shooting and asked her if they could search the home for a gun, she refused and shut the door.[17]

Not long after Williams shut the back door, Lieutenant Conley heard a crashing sound that seemed to come from the third floor, so he and Detective Schmidt knocked on the door again.[18] In that intervening period, Williams had removed a gun from a second-floor closet and hid it in a box in a third-floor crawlspace in her daughter's bedroom.[19]

---

[9] *Id.* at 23.
[10] *Id.* at 23-29; Exs. 5, 6 (consent to search mobile devices).
[11] Doc. #46 at 102, 106, 251-52.
[12] *Id.* at 30, 69-70.
[13] *Id.* at 30-31, 170, 267; Exs. 1, 2, and 3 (photos of residence from different angles).
[14] Doc. #46 at 31.
[15] *Id.* at 31-32, 193-94.
[16] *Id.* at 35.
[17] *Id.* at 133, 168, 194, 269-70.
[18] *Id.* at 134-35, 195.
[19] *Id.* at 280-81, 291-92; Ex. 17 at 3 (written statement by Williams).

After she hid the gun, Williams heard another knocking, this time from the other side of her house at the front door.[20] Williams testified that when she answered the back door, Lieutenant Conley and Detective Schmidt walked in, again uninvited.[21] For his part, Lieutenant Conley testified that he could not remember how he and Detective Schmidt got inside but was sure that they did not force their way in.[22] Detective Schmidt testified that they asked to enter, and Williams acquiesced.[23] I credit the officers' account that they did not enter the house without consent of Williams.

Lieutenant Conley noticed Williams had cobwebs on her robe.[24] He told her he thought that the crashing noise resulted from her attempt to hide a gun, but she said it was because she had knocked over her daughter's dollhouse.[25]

In the meantime, Detective Wilbur and Officer Tangney were talking with Davenport in the driveway.[26] Upon Detective Wilbur's request, Davenport gave the officers oral consent to search the residence.[27] Around this time, Officer Karasuk returned to the scene and retrieved a written consent-to-search form.[28] After Detective Wilbur read the form aloud to Davenport, and after Davenport was given an opportunity to review it, Davenport signed it around 11:20 a.m. with Detective Wilbur and Officer Tangney as witnesses.[29] On the form that Davenport signed, he acknowledged in relevant part that he was "informed of my Constitutional right not to have a search performed without a search warrant and of my Constitutional right to refuse to consent to

---

[20] Doc. #46 at 271, 293.
[21] *Ibid.*
[22] *Id.* at 138.
[23] *Id.* at 196.
[24] *Id.* at 137-39; Exs. 9, 10 (front and back photos of Williams in her robe).
[25] Doc. #46 at 135, 144, 195-96.
[26] *Id.* at 32.
[27] *Id.* at 32-33.
[28] *Id.* at 226-27.
[29] *Id.* at 35-37, 89-92; Ex. 7 (written consent to search residence).

such a search" and that this "written permission is granted by me[] knowingly, willingly and voluntarily[] to the above named police officer(s)."[30]

Several of the officers testified that after Davenport signed the form consenting to the search of the residence, he called up to Williams and told her to let the officers search the residence.[31] Two of the police officers testified that, upon hearing that Davenport had consented to a search of the home, Williams gave them oral consent to search but refused to put it in writing.[32] For her part, Williams testified that she had refused to consent until that point, but then when shown the consent form that Davenport had signed, she said: "Okay, well, go ahead. There's nothing I can do."[33]

The police searched the residence and found the gun where Williams had hidden it in an attic crawlspace behind a cubbyhole door that had a child's doll house in front of it.[34] Williams then gave a sworn statement discussing how she hid the gun and also stating that she had consented to the search of the residence.[35]

Up until this point, Davenport had been polite, friendly, and calm, and he had not been placed in handcuffs.[36] At no point did the police draw their weapons.[37]

After the gun was located, Lieutenant Conley went out on the back porch and told Detective Wilbur in coded terms that a gun had been found and that Davenport should be placed under arrest.[38] Detective Wilbur's first reaction was to say to Davenport, "It looks like they

---

[30] *Ibid.*
[31] Doc. #46 at 37, 93, 198-99.
[32] *Id.* at 140, 198-200.
[33] *Id.* at 271-76.
[34] *Id.* at 143-46, 200; Exs. 12-16 (photos of dollhouse, crawlspace, box with gun, and gun).
[35] Doc. #46 at 202-210, 236, 300-06; Ex. 17 (written statement of Williams).
[36] Doc. #46 at 13, 39, 92-95, 118, 120, 226.
[37] *Id.* at 13, 22, 56, 86, 98, 127, 141, 189, 196-97, 221, 283.
[38] *Id.* at 40, 147-48.

found something."[39] Davenport immediately responded, "It's not mine. It's not mine," to which Detective Wilbur replied, "Well, they obviously found a firearm in the house."[40]

After Detective Wilbur suggested it might help to prove Davenport's claim that the gun was not his, Davenport consented in writing to submit to a DNA swab.[41] But then after Lieutenant Conley came down and spoke with Davenport about the gun, Davenport relented and admitted that the gun was his.[42] Davenport had been told that he was going to be placed under arrest before he made this incriminating statement.[43] Officer Tangney then placed Davenport in handcuffs and brought him to the police station for booking.[44] Despite having been questioned about the gun, Davenport was not given his *Miranda* rights at any point before he was brought to the police station.[45]

Davenport was arrested on the charge of criminal possession of a firearm in violation of Conn. Gen. Stat. § 53a-217.[46] At the police station, Officer Karasuk was the booking officer for Davenport, and he testified that "we go through *Miranda* rights, the booking photo, fingerprints, all the tabs: who, what, where, when."[47] As part of the booking process, he gave and reviewed with Davenport a standardized State of Connecticut Judicial Branch form (JD-CR-5) entitled "Notice of Rights—Bail."

> 1. You have the right to not say anything about this offense you are charged with; you may remain silent.

---

[39] *Id.* at 40.

[40] *Ibid.*

[41] *Id.* at 40-43, 96-98; Ex. 8 (consent to buccal swab).

[42] Doc. #46 at 44, 98. As discussed below, the Government does not intend to offer this incriminating statement in its case-in-chief at trial.

[43] *Id.* at 122.

[44] *Id.* at 98-99.

[45] *Id.* at 118.

[46] The State of Connecticut Judicial Branch website reflects that this state law charge remains pending notwithstanding his separate prosecution in this federal case. *See* https://www.jud2.ct.gov/crdockets/CaseDetail. aspx?source=Pending&Key=61145800-68dd-4992-8982-e8624b850812  (Case docket no.: K21N-CR18-0136529-S) (last accessed November 17, 2020) [https://perma.cc/34WZ-QHN5].

[47] Doc. #46 at 236.

2. Anything you say or any statements you make may be used against you.

3. You have the right to talk with an attorney before being questioned, you may have an attorney with you, and you cannot be questioned without your consent.

4. If you are unable to pay for an attorney you will be referred to a Public Defender Office where you may ask for an attorney to represent you.

5. *(This does not apply if were arrested on a Superior Court Warrant that specified that bail should be denied or that ordered that you be brought before a clerk or assistant clerk of the Superior Court.)* You have a right to be promptly interviewed about the terms and conditions of your release pending further proceedings, and if you ask, you may have an attorney with you during this interview.[48]

Officer Karasuk testified that as he presented the bail form to Davenport he simultaneously gave Davenport an oral statement of the rights contained in the form:

You have the right not to say anything about the offense you are charged with. Anything you say can be used against you. You have the right to talk with an attorney before being questioned about the offense. And if you can't afford an attorney, a public defender can be provided for you.[49]

Both Officer Karasuk and Davenport signed the form at 2:19 p.m.[50] Under a heading for "Offenses charged," the form reflected a charge of criminal possession of a firearm in violation of Conn. Gen. Stat. § 53a-217.[51] Davenport added his signature below the following advisory: "I have been advised of my rights as stated above and have received a copy of this notice."[52]

---

[48] Ex. 19 (bail form); Doc. #46 at 237.

[49] *Id.* at 262; *accord id.* at 260. Officer Karasuk initially testified that he gave Davenport the following advisory: "[Y]ou have the right to remain silent. Anything you say can be used against you. You have the right to talk to an attorney before being questioned about the offense you are charged with. If you can't afford an attorney, a public defender can be provided for you." *Id.* at 238. Unlike the other two versions as recounted by Officer Karasuk, this third version of the advisory does not present the right to remain silent as specific to the offense for which Davenport was arrested, and I conclude that what Officer Karasuk orally told Davenport corresponds to the two later versions he testified that he recited and that also correspond more closely to the words of the written form. *See also id.* at 257 (Karasuk testimony that he could not remember the "[e]xact words" he used but that "every time is similar").

[50] Ex. 19.

[51] *Ibid.*

[52] *Ibid.*

After the booking, Davenport went to an interview room where he was subject to a video interview led by Detective Besse.[53] The video reflects that Detective Besse showed Davenport a copy of the signed bail form, then asked him whether he had been advised of his rights and understood his rights, to which Davenport replied: "Yes, I do."[54] Detective Besse questioned him, and Davenport admitted that he got the gun found in his residence.[55]

**DISCUSSION**

Davenport moves to suppress the evidence including the firearm that was seized from his residence on the ground that this evidence was seized in violation of the Fourth Amendment. He also moves to suppress any statements he made on the ground that they were elicited in violation of his *Miranda* rights.

### Fourth Amendment

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. A "search" occurs for purposes of the Fourth Amendment if the police seek information by intruding on a person's reasonable expectation of privacy or by means of trespassing upon one's person, house, papers, or effects. *See United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). When the police search a person's home, the Fourth Amendment ordinarily requires the police to first obtain a warrant from a neutral and detached magistrate based upon a showing of probable

---

[53] Ex. 20a-e (portions of video interview).
[54] Ex. 20a (14:57:53-14:58:09).
[55] Ex. 20 (interrogation of Davenport); Doc. #46 at 241-42.

cause to believe that evidence of a crime will be found there. *See Johnson v. United States*, 333 U.S. 10, 14 (1948); *United States v. Clark*, 638 F.3d 89, 93-101 (2d Cir. 2011).

The warrant requirement, however, is subject to numerous exceptions. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). Among these exceptions is when a person voluntarily consents to a search. *See United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). As the Supreme Court has explained, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Government must prove that the consent obtained was a product of the person's free and unconstrained choice rather than a mere acquiescence to a show of authority. *See Iverson*, 897 F.3d at 458; *see also United States v. O'Brien*, 926 F.3d 57, 75-77 (2d Cir. 2019) (discussing principles governing whether a consent to search is voluntary).

I conclude that Davenport voluntarily consented to the officers' request to search his residence. In the hour or so preceding Davenport's written consent to the search of his residence, he "was not placed in handcuffs or restrained in any other way; was not told that he was under arrest; was not subjected to a show of force; was not threatened in any way; and was not told that he was not free to go." *United States v. Gomez*, 199 F. Supp. 3d 728, 746 (S.D.N.Y. 2016), *aff'd*, 751 F. App'x 63 (2d Cir. 2018). I also credit the officers' testimony that Davenport appeared calm and collected for the entire period leading up to the search and that he was read aloud and given an opportunity to review the consent form before he signed it. By signing the form, Davenport acknowledged that he was aware of his right to refuse a warrantless search. He voluntarily chose to consent to a search of his home. I do not credit the claims made in

Davenport's affidavit (Doc. #18-2 at 8-9) that he refused to consent to a search of his home and that the officers lied to Williams about his having signed a consent form to search the house.

Davenport further argues that his consent was ineffective in the absence of lawful consent by Williams. But even assuming that the officers did not lawfully obtain Williams' consent to search the residence, this makes no difference to the rights of Davenport to seek suppression of evidence. It is axiomatic that a defendant may only complain of a violation of his own Fourth Amendment rights and not the violation of the Fourth Amendment rights of anyone else. *See, e.g., United States v. Payner*, 447 U.S. 727, 731 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). When Davenport consented to the search of his residence, he gave up any claim or personal right that he had against the police entering his home to conduct a search.

Davenport misplaces his reliance on *Georgia v. Randolph*, 547 U.S. 103 (2006), in which the Supreme Court held that a warrantless search of a defendant's home was unreasonable as to a defendant who refused to consent to the search of his home when the police instead relied on the consent of a co-occupant of the defendant's home. Here, however, the roles are reversed from those in *Randolph*: it is the defendant (Davenport) who chose to consent to the search of his home while the co-occupant (Williams) allegedly did not. In view of Davenport's lawful consent, it cannot be said that the police acted unreasonably *as to Davenport* by searching the home just as he gave them his consent to do. Because Davenport has no standing to assert the rights of Williams, it is irrelevant whether the police violated the rights of Williams by entering or searching the home as they did.

Davenport argues that the validity of his own consent was tainted by the prior illegality of the officers' allegedly unlawful entry into the house without the consent of Williams or Davenport. *See United States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006) (consent to search may

be tainted by prior illegal entry); *see also Utah v. Strieff*, 136 S. Ct. 2056, 2060-62 (2016)
(general discussion of causal principles governing whether evidence may be suppressed as fruit
of prior illegality). But the evidence does not show that the police entered the home illegally in
the first place and, even if they did, the evidence does not show that any such illegality causally
affected the validity or voluntariness of Davenport's consent.

For example, the record does not show that the police learned anything as a result of their
initial entry into the home that affected their decision to seek Davenport's consent. *Compare
Murray v. United States*, 487 U.S. 533, 542, 543 (1988) (independent source exception to
exclusionary rule not applicable "if the agents' decision to seek the warrant [for search of
property] was prompted by what they had seen during the [illegal] initial entry" of the property,
and remanding for further consideration because district court "did not explicitly find that the
agents would have sought a warrant if they had not earlier entered the warehouse" where they
saw contraband).

Nor does the evidence show that Davenport's decision to consent was coerced or
influenced in any manner by any allegedly unlawful actions by the police to enter the home
without consent or with respect to their interactions with Williams. At all relevant times,
Davenport was in the driveway outside the house, and it is implausible that he could hear what
the police were doing or saying inside the house. Both Detective Wilbur and Officer Tangney—
who were with Davenport outside in the driveway—testified they did not hear what the police
were doing inside the house.[56] The evidence shows that it was necessary to yell in order for
communications at the top of the stairwell to reach the driveway, and the only instances of that
happening were when Davenport allegedly yelled up to tell Williams to let the officers search the

---

[56] Doc. #46 at 79, 92, 109-10.

house and when Lieutenant Conley later yelled down the coded signals that a gun was found and to arrest Davenport.[57] Accordingly, the record shows no basis to conclude that any prior illegality by the police rendered involuntary or otherwise tainted the validity of Davenport's consent to search his home.

In short, the police obtained a valid and voluntary consent from Davenport to search his home. Even assuming that the police violated the rights of Williams by entering the home without her consent and over her objection, Davenport has no standing to assert any Fourth Amendment rights of Williams. Moreover, even assuming that the police initially violated the rights of Davenport by entering the home before they had obtained Davenport's consent, Davenport has not shown that such prior illegality affected the validity or voluntariness of the intervening consent that he gave to the police to search his home.

As the Supreme Court has noted, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Strieff*, 136 S. Ct. at 2061. Because Davenport voluntarily consented to the search of his home, his Fourth Amendment interests would not be served by suppressing evidence seized by the police from his home even assuming that the police made any unlawful entry into the home prior to his consent being secured. Accordingly, I will deny the motion to suppress as to the evidence found in Davenport's home.

---

[57] *Id.* at 37-38, 40, 93, 95, 117, 196, 198.

### The Miranda *warnings and waiver*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court famously ruled that the prosecution may not use a suspect's statements against him at trial if the statements were the result of custodial interrogation and if the police did not employ appropriate procedural safeguards to protect the Fifth Amendment privilege against self-incrimination. One of these safeguards—what is well known as "*Miranda* warnings"—requires that the police warn a suspect in custody of the following rights before subjecting the suspect to interrogation:

> [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Florida v. Powell*, 559 U.S. 50, 59-60 (2010) (quoting *Miranda*, 384 U.S. at 479).

*Miranda* does not impose on the police a "talismanic incantation" requirement to repeat verbatim the warnings as articulated by the Supreme Court. *See California v. Prysock*, 453 U.S. 355, 359 (1981). It is not the case "that any slight variance from the standard *Miranda* warnings will necessarily invalidate a defendant's waiver of his or her *Miranda* rights." *United States v. Murphy*, 703 F.3d 182, 193 (2d Cir. 2012) (citing *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989)). The test of whether any given set of warnings is adequate "is simply whether the warnings reasonably 'convey to a suspect his rights as required by *Miranda*.'" *Powell*, 559 U.S. at 60 (quoting *Duckworth*, 492 U.S. at 203) (cleaned up); *accord Murphy*, 703 F.3d at 193.

If the prosecution wishes to introduce at trial the statements of a defendant that were made to the police in response to custodial interrogation, the prosecution bears the burden to

prove that the defendant validly waived his *Miranda* rights. *Ibid.* The prosecution can meet that burden only by showing that the defendant's waiver was both knowing and voluntary—first, that the waiver was made "*with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," and second, that the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *O'Brien*, 926 F.3d at 73  (emphasis in original; internal citations and quotation marks omitted); *see also United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (same). Thus, the validity of any waiver of rights under *Miranda* presupposes that the police have reasonably conveyed the content of a suspect's *Miranda* rights in the first place.[58]

As noted above, Davenport was subject to custodial interrogation at the Norwich police station. Before the interrogation he received the warnings that Connecticut police officers routinely give suspects in accordance with a pre-printed form titled "Notice of Rights – Bail" that is issued by the State of Connecticut Judicial Branch:

> 1. You have the right to not say anything about this offense you are charged with; you may remain silent.
> 2. Anything you say or any statements you make may be used against you.
> 3. You have the right to talk with an attorney before being questioned, you may have an attorney with you, and you cannot be questioned without your consent.

---

[58] There is no dispute that Davenport had not been given *Miranda* warnings at the time he made an incriminating admission about the gun while standing in his driveway. One of the police witnesses admitted in response to my questioning at the suppression hearing that the police told Davenport that he was going to be arrested at the time that he was questioned in his driveway about whether the gun that the police recovered from the house was his. Doc. #46 at 122. In light of this testimony, Davenport was clearly in custody at the time of the questioning, *see United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017), and the Government has wisely abandoned its intent to introduce Davenport's un-*Mirandized* statement about the gun while he was in his driveway. Doc. #50-1 at 2. I have no occasion to address whether any *Miranda* violation that occurred with respect to Davenport's driveway statement taints the validity of any subsequent post-*Miranda* statement at the police station, because Davenport has not argued that the police deployed a two-part questioning strategy without curative measures and with an intention to undermine his *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *United States v. Williams*, 681 F.3d 35 (2d Cir. 2012). Nor need I rule at this time whether any unwarned statements could be used by the Government for cross-examination purposes in the event that Davenport were to testify at trial.

4. If you are unable to pay for an attorney you will be referred to a Public Defender Office where you may ask for an attorney to represent you.

5. *(This does not apply if were arrested on a Superior Court Warrant that specified that bail should be denied or that ordered that you be brought before a clerk or assistant clerk of the Superior Court.)* You have a right to be promptly interviewed about the terms and conditions of your release pending further proceedings, and if you ask, you may have an attorney with you during this interview.[59]

Davenport raises several challenges to the adequacy of the warnings he received. To begin, he argues that the first enumerated warning ("1. You have the right to not say anything about this offense you are charged with; you may remain silent") misadvised him that he had a right to be silent *only* about the offense he was charged with and not about other matters.

I agree as a threshold matter that the *Miranda* right to silence is not specific to statements about any particular offense. *See, e.g., McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (*Miranda* right to counsel not offense-specific); *Mathis v. United States*, 391 U.S. 1, 4-5 (1968) (*Miranda* protection not limited to crime for which suspect is in custody). For that matter, the *Miranda* right to silence extends not just to statements about offenses or crimes but to any testimonial subject matter at all. *See, e.g., Pennsylvania v. Muniz*, 496 U.S. 582, 597 (1990) (explaining how *Miranda* applies "[w]henever a suspect is asked for a response requiring him to communicate an express or implied assertion of fact or belief" and concluding that the police violated *Miranda* when they did not give him *Miranda* warnings prior to asking him to state the date of his sixth birthday).[60]

---

[59] Ex. 19 (bail form); Doc. #46 at 237.

[60] The *Miranda* rule has certain subject-matter exceptions for routine booking questions or questions necessary for immediate public safety purposes. *See United States v. FNU LNU*, 653 F.3d 144, 149 (2d Cir. 2011). But there is no suggestion that these very limited exceptions apply in this case to the interrogation of Davenport which occurred only after he had already been booked at the police station.

In light of the breadth of the *Miranda* right to silence, the first enumerated warning on the Connecticut Judicial Branch bail form creates needless ambiguity about the scope of a suspect's right to silence. On the one hand, it could be read to mean that the suspect has a categorical right to silence that includes, merely by way of example, a right to silence about the offense with which he has been charged. On the other hand, it could be read to mean that the suspect's right to silence extends only to the offense charged against him.

Indeed, in light of this ambiguity, the Massachusetts Supreme Judicial Court has voiced doubt about the validity of this type of offense-specific warning as it appears in the Connecticut Judicial Branch bail form.  *See Commonwealth v. Ghee*, 607 N.E.2d 1005 (Mass. 1993) (evaluating prior version of the Connecticut Judicial Branch bail form which stated that "'[y]ou are not obligated to say anything, in regard to this offense you are charged with but may remain silent,'" and observing that "the warning arguably implied that, although [the defendant] did not have to talk about offenses with which he was charged, the defendant did have to talk about offenses with which he was not charged").

If I were to consider solely the first warning, I would conclude that it does not reasonably convey a suspect's *Miranda* right to silence. It is most naturally understood to mean that the right to silence extends only to the offense that has been charged against the defendant.[61]

But the adequacy of *Miranda* warnings must be evaluated in light of the entirety of all the warnings given and not out of context or by reference only to particular portions. *See Powell*, 559 U.S. at 62. Here, the inadequacy of the first warning is salvaged by the third enumerated

---

[61] To make matters worse, Davenport was in fact subject to questioning about matters well beyond the state law offense of criminal possession of a firearm for which he was arrested. Detective Besse questioned him at length about his other activities related to the feud at the bar the night before. Moreover, the federal offense charged in this case is *not* the same as the state offense for which Davenport was arrested. *See Gamble v. United States*, 139 S. Ct. 1960 (2019).

warning which states in relevant part that "you cannot be questioned without your consent." There is no way to understand this additional warning to mean anything other than a categorical right of the suspect not to respond to questioning about any subject matter. Accordingly, I conclude on balance that the Connecticut Judicial Branch bail form reasonably conveys the substance of a suspect's *Miranda* right to silence.[62]

Davenport also argues that the Connecticut Judicial Branch bail form fails to adequately advise a suspect of his *Miranda* right to counsel. He focuses on testimony that he was orally advised that "[i]f you can't afford an attorney, a public defender can be provided for you." Similarly, the fourth enumerated warning in the Connecticut Judicial Branch bail form states: "If you are unable to pay for an attorney you will be referred to a Public Defender Office where you may ask for an attorney to represent you." According to Davenport, these warnings were defective because he was told only that "he may ask for" counsel or that counsel "can" be provided him, but without making clear that counsel must be appointed if he is unable to pay.

I do not agree. In light of the separate statement in the third enumerated warning that "[y]ou have the right to talk with an attorney before being questioned," the warning about the appointment of counsel is most reasonably understood to assure that counsel would be appointed if the suspect could not afford to retain counsel. *See United States v. Miguel*, 952 F.2d 285 (9th Cir. 1991) (*per curiam*) (rejecting similar challenge to adequacy of *Miranda* warning that

---

[62] The Connecticut Judicial Branch bail form cites as its source of authority various provisions of the Connecticut General Statutes and the Connecticut Practice Book. *See* Gov. Ex. #19 (citing Conn. P.B. §§ 37-3, 38-1 and 38-2, and Conn. Gen. Stat. §§ 54-1b, 54-2a, 54-63c, and 54-64b). Unlike the Connecticut Judicial Branch's bail form, those warnings that are recited in the Connecticut General Statutes and the Connecticut Practice Book do not have language to suggest that the *Miranda* right to silence is limited to the offense that has been charged. *See* Conn. Gen. Stat. § 54-1b (warning in relevant part that the suspect "has a right to refuse to make any statement"); Conn. Pract. Book § 37-3(1) (warning in relevant part that "the defendant is not obligated to say anything"). This discrepancy between the form and its cited source authorities makes it all the more puzzling why the Connecticut Judicial Branch has chosen to use language in the form that—when read in isolation—has a potential to mislead a suspect about the scope of his or her *Miranda* rights.

"You may have an attorney appointed by the U.S. Magistrate or the Court to represent you, if you cannot afford or otherwise obtain one" where the warning was preceded by a warning that that he had a right to consult with an attorney before answering questions or making any statements, that he was entitled to have the attorney present during questioning and that he could end police interrogation at any time by asking to speak to an attorney); *United States v. Reyes-Laguna*, 2009 WL 1396359, at *2 n.2 (S.D. Cal. 2009) (although "*Miranda* requires that police inform a suspect that 'if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires,'" a warning stating that an attorney "'can be provided' rather than 'will be appointed'" adequately "conveys the principle that an attorney would be provided by the government prior to questioning if defendant so desired").

Davenport relies on the Ninth Circuit's more recent decision in *United States v. Botello-Rosales*, 728 F.3d 865 (9th Cir. 2013) (*per curiam*), which invalidated a warning—as translated from Spanish—stating that "[i]f you don't have the money to pay for a lawyer, you have the right. One, who is free, could be given to you." *Id.* at 867. The court in *Botello-Rosales* invalidated the warning for two reasons. First, the warning as translated from English to Spanish used the Spanish term "libre" which means "free" or "at liberty," rather than an appropriate Spanish term to mean "at no cost or charge." Second, the court concluded that "[t]he phrasing of the warning—that a lawyer who is free could be appointed—suggests that the right to appointed counsel is contingent on the approval of a request or on the lawyer's availability, rather than the government's absolute obligation." *Ibid.*; *see also United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003) (invalidating warning stating that the suspect could "solicit the court" for a lawyer because "[t]o be required to 'solicit' the court … implies the possibility of rejection" such

that the "warning was constitutionally infirm because it did not convey to [the defendant] the government's *obligation* to appoint an attorney for indigent accused") (emphasis in original).

Subsequent panels in the Ninth Circuit have declined to follow *Botello-Rosales* in cases where there was no translation error and where the right to have counsel appointed was framed in terms stating that counsel "could" or "can" be appointed if the defendant was unable to afford counsel. *See United States v. Madero-Diaz*, 817 F. App'x 489, 489-90 (9th Cir. 2020) (declining to find invalid a warning stating that lawyer "can be provided," because "the use of the word 'can' instead of 'will' did not suggest that the right to appointed counsel was a mere possibility, rather than an obligation on the part of the Government"); *United States v. Smith*, 728 Fed. Appx. 779, 780 (9th Cir. 2018) (distinguishing *Botello-Rosales* on ground that it relied in part on "a serious translation error" and declining to find invalid a warning stating that "'if you can't afford to hire a lawyer, one could be provided to you free of charge,'" in view that the defendant "has not identified a single case indicating the use of language like 'could be provided,' standing alone, renders a *Miranda* warning misleading").

Although the issue is somewhat close, I am convinced on balance that the warnings as provided to Davenport would be reasonably understood to mean that counsel would be appointed if Davenport could not afford counsel and wished for the assistance of counsel. The warnings that Davenport received reasonably conveyed his right to have counsel appointed if he could not afford counsel.

Davenport further argues that he was not informed of his right to end the questioning at any time. But *Miranda* does not require that the police advise a suspect that he may terminate questioning. *See United States v. Crumpton*, 824 F.3d 593, 611 (6th Cir. 2016) (collecting cases). Nor is there any substance to Davenport's cursory argument that the Connecticut Judicial Branch

bail form "misleadingly ties an arrestee's *Miranda* rights to his or her right to bail." Doc. #47 at 31.

All in all, I conclude that the warnings received by Davenport reasonably conveyed—if only barely so—the substance of his *Miranda* rights. "Although the warnings were not the *clearest possible* formulation of *Miranda*'s right-to-[silence-and-]counsel advisement, they were sufficiently comprehensive and comprehensible when given a commonsense reading." *Powell*, 559 U.S. at 63.

Lastly, Davenport argues that he did not validly waive his *Miranda* rights. To the extent that he claims he was not validly apprised of his *Miranda* rights in the first place such that there could be no valid waiver, I have already rejected his arguments that the *Miranda* warnings were not reasonably conveyed to him. To the extent that he claims that the Connecticut Judicial Branch bail form that he signed constituted only an acknowledgement and not an express waiver of his rights, this argument overlooks the rule that a waiver may be explicit or implicit as inferred from the choice of a suspect to respond to questioning after having been properly advised of his *Miranda* rights: "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

The record here clearly shows that Davenport understood the warnings he was given prior to his interrogation at the police station and that he therefore waived his rights by choosing to respond to questioning from the police. As the video of his interview reflects, Detective Besse showed Davenport a copy of the signed bail form, then asked him whether he had been advised

of his rights and understood his rights, to which Davenport replied: "Yes, I do."[63] This was easily enough to conclude that Davenport knowingly waived his *Miranda* rights.

The very purpose of having a standardized *Miranda* waiver form is to ensure that the police will reliably and correctly advise a suspect in custody of his or her rights before they conduct an interrogation. It is unclear to me why the Connecticut Judicial Branch would choose to propagate a form using warnings that significantly depart from the simple verbal formulations set forth in *Miranda* itself and that create at least some unnecessary risk of confusion about whether the right to silence is offense-specific and whether the right to counsel will be honored if the suspect cannot afford counsel. Nor is it clear why the Connecticut Judicial Branch form is cast as a mere notice of rights and does not expressly advise a suspect that he is waiving his rights if he chooses to respond to police questioning without invoking his right to silence or his right to counsel. Although I have concluded that the Connecticut Judicial Branch bail form complies—if barely—with *Miranda*, I could readily understand if other judges might reach a different conclusion.

### CONCLUSION

For the foregoing reasons, the motion to suppress (Doc. #18) is DENIED.

It is so ordered.

Dated at New Haven this 19th day of November 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[63] Ex. 20a (14:57:53-14:58:09).